United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KWESI MUHAMMAD,
Plaintiff,

v.

CRAIG KOENIG, et al.,
Defendants.

Case No. 24-cv-07884-AMO (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 21

## I. INTRODUCTION

Plaintiff Kwesi Muhammad filed this civil action pursuant to 42 U.S.C. § 1983, representing himself and alleging constitutional violations that took place at the Correctional Training Facility ("CTF") in 2020. Dkt. 1. In his complaint, Muhammad names as defendants Former CTF Warden Craig Koenig and CTF Chief Executive Officer ("CEO") for Health Care Bayode Omosaiye. *Id.* at 2.[1] He seeks monetary and punitive damages. *Id.* at 6.

Before the Court is Defendants' Federal Rule of Civil Procedure 56 motion for summary judgment. Muhammad filed his opposition and a declaration in support of his opposition. Dkts. 26-27. Defendants then filed their reply. Dkt. 29. Having read and considered the papers submitted, as well as relevant legal authority, the Court **GRANTS** Defendants' motion for summary judgment.

## II. FACTUAL BACKGROUND

### A. Muhammad's Version

Muhammad claims that beginning in August to December 2020, Defendants failed to take reasonable measures to safeguard him from being exposed to COVID-19 and to abate the

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

substantial risk of harm posed by COVID-19. Dkt. 1 at 3-4. On June 22, 2020, Defendant Koenig, who was then the warden of CTF, implemented a modified program that affected Muhammad's access to showers. *Id.* Under the new program, all four showerheads, spaced approximately two feet apart, in the shower room had to be used simultaneously for all inmates to shower within their allocated one-hour period. *Id.* There was also no time for the showers to be disinfected between each use because the showers were in constant use for the one-hour time frame. *Id.* Additionally, Muhammad contends that Defendants did not distribute any KN95 or N95 respirators to inmates to mitigate their exposure to COVID-19. *Id.* at 4-5.

Around August 6, 2020, an inmate tested positive for COVID-19 and other inmates soon began testing positive as well. *Id.* at 3. Muhammad alleges that inmates contracted COVID-19 because they were showering en masse without the ability to remain at least 6 feet apart. *Id.*

In November 2020, Muhammad tested positive for COVID-19. *Id.*

Defendant Koenig was responsible for maintaining the safety and health of inmates and staff at CTF, and he was involved in the decision-making process that led to the unsafe conditions of confinement in which Muhammad contracted COVID-19. *Id.* at 4. Defendant Omosaiye, who was then the CEO for Health Care, served as a principal advisor in institution-specific application to healthcare policies and procedures. *Id.* at 5.

Muhammad claims that Defendants Koenig's and Omosaiye's "inexplicable failure to distribute readily available KN95 respirators to [Muhammad] to mitigate his further exposure to COVID-19 during a five month long outbreak at CTF recklessly exposed [Muhammad] to foreseeable, actual, and particularized danger from a serious, communicable disease, which in its severest form caused death." *Id.* Muhammad claims that as a direct result of contracting COVID-19 in November 2020, he "now suffers from long COVID and post COVID-19 related chronic fatigue syndrome." *Id.* at 3.

The Court found that, liberally construed, Muhammad's allegations "relating to the actions, or more specifically the *failure* to act, of Defendants Koenig and Omosaiye stated claims for relief under the Eighth Amendment." Dkt. 5 at 4 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (prison official is deliberately indifferent if he or she knows that prisoner faces

substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it)).

**B. Defendants' Version**

Defendants contend that they did not interact with Muhammad during the relevant time frame in 2020. Koenig Decl. ¶ 2, Omosaiye Decl. ¶ 3, Zhang Decl. ¶ 3, Ex. A ("Muhammad's Dep.") at 109:11-13. Defendants were not aware that Muhammad had contracted COVID-19 in November 2020 until after he filed his first complaint in this lawsuit. Koenig Decl. ¶ 2, Omosaiye Decl. ¶ 3.

Between February 2020 to November 2021, Defendant Koenig was the warden at CTF. Koenig Decl. ¶ 1. As the warden, Defendant Koenig was responsible, along with health care staff, for establishing and enforcing the operational plans and procedures of the prison, including those related to CTF's and the California Department of Corrections and Rehabilitation's ("CDCR's") response to the COVID-19 pandemic. Koenig Decl. ¶ 3. The associate wardens, captains, and other subordinate facility staff were responsible for implementing and ensuring daily compliance with policies and procedures within each facility, including those policies and policies addressing the COVID-19 pandemic. *Id.*

At all relevant times, Defendant Omosaiye was the CEO of Health Care at CTF. Omosaiye Decl. ¶ 1. Defendant Omosaiye oversees the administrative management and operations of health services at the prison. Omosaiye Decl. ¶ 1. He also supervises staff assigned to the health care department in the performance of their non-clinical duties. *Id.* During 2020, Defendant Omosaiye oversaw compliance with the policies and guidance issued by California Correctional Health Care Services ("CCHCS"), the California Department of Public Health ("CDPH"), and the Centers for Disease Control and Prevention ("CDC") relating to the care, containment, and prevention of COVID-19. *Id.* Defendant Omosaiye's duties did not include monitoring or distribution of personal protective equipment or face coverings to inmates. Omosaiye Decl. ¶ 5.

CTF implemented extensive COVID-19 mitigation measures beginning in 2020, in compliance with CDCR and CCHCS policy. Beginning in April 2020, social distancing

requirements were implemented throughout all CTF facilities, except where institutional security needs dictated otherwise. Koenig Decl. ¶ 5, Handley Decl. ¶ 11. In accordance with social distancing requirements, all staff and inmates were required to keep six feet apart from each other to prevent the spread of COVID-19. *Id.* Generally, facility dayrooms were activated only when staff determined social distancing was possible. Handley Decl. ¶ 18. At times, dayroom use was completely suspended for up to fourteen days to prevent the spread of COVID-19, based on guidance in place at the time. *Id.*

On or around April 25, 2020, to prevent the spread of COVID-19, and in accordance with CCHCS directives at the time, cloth face masks were distributed to all inmates at CTF, with additional cloth masks available upon request. Koenig Decl. ¶ 8, Handley Decl. ¶ 5, Ex. D. Additional cloth masks were distributed to inmates on a weekly schedule. *Id.* Inmates were required to wear their masks at all times when outside of their cells, unless institutional security needs dictated or required otherwise. Handley Decl. ¶ 5.

On June 22, 2020, CTF implemented a mandatory modified program in response to a statewide surge of positive cases of COVID-19. Koenig Decl. ¶ 4, Handley Decl. ¶ 3. The modified program remained in effect until January 6, 2021, when CTF continued to use a multi-phased approach to determine which areas could safely return to regular programming. *Id.*

The requirements of the modified program were wide-ranging and directed at limiting the spread of COVID-19. For example, the dining halls at CTF were closed to mitigate COVID-19 spread, and the institution switched to in-cell feeding. Koenig Decl. ¶ 5, Handley Decl. ¶ 12. Meals were delivered by custody staff to each occupied cell. Handley Decl. ¶ 12. At times, the modified program was partially lifted in response to directives from the CDCR Headquarters, CCHCS, and CDPH. *Id.* During these times, inmates were permitted to use the dining halls and were released in staggered timing such that only one housing unit used the dining hall at any given time. *Id.* At all times in the dining hall, inmates and staff were required to maintain six-foot social distancing and wear their masks when not eating or drinking. *Id.* Inmate porters also disinfected tables and serving lines between the release of each housing unit to the dining halls. *Id.*

United States District Court
Northern District of California

Inmate work assignments were reduced in response to the COVID-19 pandemic. Handley Decl. ¶ 15. Critical workers, such as porters, continued working to address the needs of the institution. *Id.* However, all noncritical work assignments were suspended to reduce traffic in and out of CTF inmate populations. *Id.* Critical workers were screened for symptoms prior to release to their work assignments. *Id.* If a critical worker answered yes to any questions indicating they were symptomatic, they were escorted to the triage screening area for medical evaluation, where they would be housed depending on the results of the evaluation. *Id.*

Only the residents of a given housing unit were permitted to use the showers in that housing unit. Handley Decl. ¶ 16, Muhammad's Dep. at 24:4-6. Inmates in Muhammad's housing unit were given one hour to use the showers every 72 hours. Muhammad's Dep. at 94:17-25. Only one tier in Muhammad's housing unit was released to shower on a given day. *Id.* Cell Block 64, a hospital grade disinfectant and cleaner, was used to clean surfaces throughout CTF, including in restrooms, sinks, dayrooms, and showers. Handley Decl. ¶ 16. Cleaning was conducted in accordance with the cleaning schedule and tracked on cleaning logs. *Id.*, Ex. J. As shown in the cleaning logs, shower cleanings were conducted three times during the second and third watch of the day. *Id.*, Ex. K. Shower cleaning was conducted during the first watch only if the showers were used in that time frame, which totaled up to nine cleanings a day. Handley Decl. ¶ 15, Ex. L. Inmates were also provided with Cell Block 64 cleanser and paper towels in case they wanted to disinfect their living areas. Handley Decl. ¶ 16.

CTF also took extensive measures to encourage staff to comply with mask and screening requirements to reduce the spread of COVID-19, and it also reduced non-essential entry into the prison by screening all people entering the prison and suspending many non-critical in-person visits to CTF in 2020. *Id.* ¶ 13. General visiting was prohibited, as were family visits. *Id.* Beginning on March 16, 2020, CTF employees and inmates entering the prison were comprehensively screened, which included temperature checks and health questionnaires at entry. Handley Decl. ¶ 10, Koenig Decl. ¶ 5, Omosaiye Decl. ¶ 10. CTF also established multiple lanes at entrances into the prison such that employees could consistently maintain six feet apart and still be screened for entry in a timely manner. Handley Decl. ¶ 10. Any employees who failed to

answer all questions asking about COVID-19 symptoms in the negative were not permitted to enter the prison. *Id.* Employees were only allowed in if they were wearing a mask. *Id.* CTF staff were provided the same cloth masks which were distributed to inmates in April 2020. *Id.* ¶ 5. Generally, CTF staff were required to wear their masks at all times while on facility grounds or conducting work activities outside of CTF. *Id.* Staff were audited to ensure adherence to mask usage. Omosaiye Decl. ¶ 9. Staff who failed to wear their masks when required or who failed to follow social distancing requirements were subject to progressive discipline as outlined in Article 22 of the Department Operations Manual and Title 15 of the California Code of Regulations. *Id.*

COVID-19 baseline testing of staff began in July 2020. Handley Decl. ¶ 24. Also, if an employee was found to have spent fifteen minutes in the same room as someone who had tested positive for COVID-19, that employee would be quarantined and not let into facility grounds until after an approximate five-to-fourteen-day time frame had passed without them becoming symptomatic for COVID-19, depending on the applicable CCHCS memorandums in place at the time. Handley Decl. ¶ 24, Omosaiye Decl. ¶ 10. Medical staff conducted contact tracing to identify and test exposed inmates and staff. *Id.* Employees who had been determined to have been in close contact with a confirmed case, while not wearing appropriate facial covering, were required to quarantine at home for the period specified in the applicable CCHCS memorandums, usually between five to fourteen days. *Id.*

Once testing became available, all inmates were required to be COVID-19 tested regularly. Handley Decl. ¶ 23, Omosaiye Decl. ¶ 6. Also, once a housing unit was found to have experienced above a certain number of positive cases, that housing unit was placed on outbreak status, which meant that there was limited movement in and out of the housing unit. *Id.* During this period, all inmates who developed symptoms were also offered testing. Handley Decl. ¶ 24, Omosaiye Decl. ¶ 6. When a new positive test was discovered, medical staff conducted contact tracing of that inmate's movements to determine what areas and which inmates and staff had been exposed. *Id.* Inmates who were found to have had been in close contact with someone with COVID-19 for more than fifteen minutes were moved to a designated quarantine unit until a negative test was confirmed. *Id.* If an inmate reported symptoms or had exposure to COVID-19,

a medical provider issued an order for quarantine, which involved placement of the inmate in a designated quarantine cell until a positive or negative test was confirmed. *Id.*

If an inmate tested positive, the inmate was isolated in one of CTF's designated medical isolation cells, where the inmate received daily health care monitoring. Handley Decl. ¶ 25, Omosaiye Decl. ¶ 7. The inmate was kept in isolation until his symptoms improved, i.e. the inmate went twenty-four hours without a fever and ten or more days without symptoms. Posson Decl. ¶ 7. Inmates who became symptomatic were taken to quarantine housing pending a COVID-19 test. Handley Decl. ¶ 25, Omosaiye Decl. ¶ 7. CTF medical staff performed rounds twice a day on inmates in quarantine. Handley Decl. ¶ 26, Omosaiye Decl. ¶ 6. Patients whose conditions worsened were sent to outside hospitals for further treatment. *Id.* Isolation and quarantine measures were still taken for inmates who refused testing, based on exposure and reported symptoms. *Id.*

Muhammad was receiving regular COVID-19 screenings beginning August 6, 2020 and leading up to November 2020. Posson Decl. ¶ 3. Muhammad tested for COVID-19 on November 11, 2020, and he received a positive result on November 13, 2020. *Id.*, Ex. A. Muhammad was moved to an isolation housing unit on November 16, 2020. *Id.*, Ex. B. Muhammad was released from the isolation housing unit on November 25, 2020. *Id.*, Ex. C.

## III. DISCUSSION

Federal Rule of Civil Procedure 56 provides that a party may move for summary judgment on some or all of the claims or defenses presented in an action. Fed. R. Civ. P. 56(a)(1). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A) (requiring citation to "particular parts of materials in the record"). If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87

(1986). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the court's task to scour the record in search of a genuine issue of triable fact. *Id*. If the nonmoving party fails to make the requisite showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

A district court may consider only admissible evidence in ruling on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e); *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, Defendants have presented various exhibits as well as their own declarations, a declaration from their attorney, Deputy Attorney General Victoria Zhang, and declarations from Associate Director of the Office of the Appeals Howard F. Moseley, CTF Correctional Captain S. Handley, and the CEO of CCHCS S. Posson.

Meanwhile, Muhammad has filed his verified complaint and declaration. *See* Dkt. 1 at 7; Dkt. 27 at 4. The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). However, Muhammad has not verified his opposition because he failed to sign it under penalty of perjury.[2] Dkt. 26 at 19.

Defendants contend they are entitled to summary judgment because: (1) the present case is barred under the doctrine of res judicata, as Muhammad previously filed another lawsuit sharing an identity of claims which was disposed of on summary judgment; (2) Muhammad failed to exhaust his administrative remedies as to his claim regarding the failure to disinfect showers because he did not identify Defendant Koenig in the relevant grievance he submitted; (3) the undisputed evidence shows that Defendants were not deliberately indifferent because they took reasonable measures to protect Muhammad from the risk posed by COVID-19; (4) Muhammad

[2] The Court notes that even if it considered the allegations in Muhammad's opposition, its conclusion below that Defendants are entitled to summary judgment would remain unchanged.

also cannot bring evidence to meet the causation requirement for a section 1983 claim; and (5) Defendants are entitled to qualified immunity. Dkt. 21-3 at 7. Because the Court resolves the motion on deliberate indifference grounds, it does not consider Defendants' other arguments.[3]

The Eighth Amendment protects prisoners from inhumane conditions of confinement and requires that prison officials take reasonable measures to guarantee the safety of prisoners. *Farmer*, 511 U.S. at 832. In order to show an Eighth Amendment violation stemming from a prison official's failure to protect inmates from dangerous conditions at the prison, a plaintiff must meet two requirements. *See id.* at 834. "First, the deprivation alleged must be, objectively, sufficiently serious." *Id.* (internal quotation marks and citation omitted). Second, the "prison official must have a sufficiently culpable state of mind," which for conditions of confinement claims, is one of "deliberate indifference." *Id.* (internal quotation marks and citation omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety. *Id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw that inference. *See id.* The circumstances, nature, and duration of the deprivations are critical in determining whether the conditions complained of are grave enough to form the basis of a viable Eighth Amendment claim. *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2006). Mere negligence on the part of a prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton. *See Farmer*, 511 U.S. at 835; *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

Here, Muhammad alleges that Defendants Koenig and Omosaiye acted with deliberate indifference by exposing him to COVID-19 in their failure to take specific measures during the early days of the COVID-19 pandemic. Dkt. 1 at 3-4. Specifically, Muhammad claims that between August and December 2020, CTF was in the midst of a COVID-19 outbreak, and Defendants failed to distribute readily available KN95 respirators to Muhammad and to disinfect

---

[3] Both parties submitted requests for judicial notice. Dkts. 21-4 & 28. Because those requests pertain to documents related to Defendants' res judicata argument, *see id.*, the Court need not consider them, and both requests for judicial notice are thus **DENIED AS MOOT**.

his housing unit showers (between each individual use) to mitigate his further exposure to COVID-19. *Id.* at 4-5. He alleges that the conditions of confinement at CTF were unconstitutional in that the conditions placed him at a "substantial risk of suffering serious harm" and thus violated the Eighth Amendment. *Id.* at 5.

First, no one questions that COVID-19 poses a "substantial risk of serious harm" to prisoners. *Plata v. Newsom*, 445 F. Supp. 3d 557, 559 (N.D. Cal. Apr. 17, 2020). The transmissibility of the COVID-19 virus in conjunction with the close-quartered living conditions in CTF are sufficient to satisfy the objective prong, i.e., that Muhammad was incarcerated under conditions posed a substantial risk of serious harm. *See Farmer*, 511 U.S. at 834. Thus, the pertinent question is whether Defendants' actions demonstrated a deliberate indifference to Muhammad's risk of harm. *Id*. The key inquiry is not whether Defendants perfectly responded or complied with every CDCR guideline, but rather whether they "responded reasonably to th[is] risk, even if the harm ultimately was not averted." *Id.* at 844.

Defendants argue that there is no evidence that sufficiently demonstrates deliberate indifference. Dkt. 21-3 at 26-27. They claim Muhammad cannot succeed on his Eighth Amendment claim because he fails to attribute any specific conduct to any of the Defendants, other than that they were supervisors, which is an impermissible basis for liability under a section 1983 claim. *Id.* at 27 (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (concluding supervisors can only be held liable under section 1983 if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them.")). Because the subjective prong for deliberate indifference cannot be established, they argue that the Court should grant summary judgment. *Id.*

Viewing the record in the light most favorable to Muhammad, there is no triable issue of material fact as to whether Defendants' actions or inactions amounted to deliberate indifference.

Muhammad bases his claims against the Defendants on their supervisorial responsibility for ensuring safety protocols were followed, *see* dkt. 1 at 3-5 & Pl's Decl. ¶¶ 12-16, but makes no showing that either of them "participated in or directed the violations, or knew of the violations and failed to act to prevent them." *See Taylor*, 880 F.2d at 1045.

United States District Court
Northern District of California

Defendants were responsible for overseeing the implementation of COVID-19 procedures in their respective departments, but they did not personally participate in the alleged violations. Koenig Decl. ¶¶ 6-8; Omosaiye Decl. ¶¶ 9-11. Muhammad does not specifically show how each Defendant (in their roles as Warden and CEO of Health Care) failed to prevent him from contracting COVID-19 during the five-month long outbreak. *See generally* Dkt. 1 & Pl's Decl. Thus, Muhammad has failed to attribute any specific conduct to Defendants such that supervisory liability would apply. *See Taylor*, 880 F.2d at 1045.

However, even if Defendants could be held liable in their supervisory role, Muhammad has not evidenced that Defendants acted with deliberate indifference. Muhammad alleges that they failed to timely implement the basic safety measures put forth by the CDCR, such as failing to either disinfect the housing unit showers between uses or distribute readily available KN95 respirators to Muhammad to mitigate his further exposure to COVID-19 during the respective five-month-long time frame. *See* Dkt. 1 at 3-5. Muhammad contends that Defendants' inactions exposed him to "foreseeable, actual, and particularized danger from a serious, communicable disease, which in its severest form caused death." *Id*. at 5. Thus, Muhammad argues, in a conclusory and speculative way, that Defendants acted with deliberate indifference by failing to follow certain COVID protocols, which led to him to test positive for COVID-19 in November 2020. *Id*. at 3-5.

When examining whether a prison official subjectively acted with deliberate indifference to the risk of COVID-19 exposure, the key inquiry is not whether the official perfectly responded, complied with every CDCR guideline, or whether the official's efforts ultimately averted such a risk. *See Farmer*, 511 U.S. at 844. Instead, it is whether the official "responded reasonably to th[is] risk." *Id.*

Here, Muhammad asserts that Defendants' inactions—i.e., their failures to distribute KN95 respirators and to disinfect his housing unit showers—caused him to test positive for COVID-19. While Muhammad presents evidence that Defendants deviated from and failed to follow certain COVID-19 protocols during the relevant time frame, *see* dkt. 1 at 3-5 & Pl's Decl. ¶¶ 5, 8, it is insufficient to demonstrate that these Defendants acted with deliberate indifference toward his

health and safety. *Cf. Fraihat v. U.S. Immigration & Customs Enforcement ("ICE")*, 16 F.4th 613, 639 (9th Cir. 2021) (holding the failure of ICE COVID-19 policies for immigration detention centers to fully align with the CDC recommendations and to strongly recommend "social distancing," did not support a finding of deliberate indifference); *see, e.g.*, *Peyton v. Cates*, No. 1:22-cv-00151-JLT-EPG (PC), 2022 WL 1430752, at *5 (E.D. Cal. May 5, 2022) (finding that "prison policy . . . alone [is not] determinative of constitutional requirements") (citation omitted), *adopted*, *Peyton v. Cates*, No. 1:22-cv-00151-JLT-EPG (PC), 2022 WL 2307789 (E.D. Cal. June 27, 2022); *Greer v. Caravajal*,[4] No. 5:22-cv-00334 VBF JDE, 2022 WL 4826513, at *9 (C.D. Cal. June 30, 2022) ("When examining whether a prison official subjectively acted with deliberate indifference to the risk of COVID-19, the key inquiry is not whether the official perfectly responded, complied with every CDC guideline, or whether his efforts ultimately averted the risk."), *report and recommendation adopted sub nom. Greer v. Carvajal*, 2022 WL 4842927 (C.D. Cal. Sept. 30, 2022) (citation omitted); *Jones v. Sherman*, No. 1:21-cv-01093 DAD EPG, 2022 WL 783452, at *8 (E.D. Cal. Mar. 11, 2022) (finding that "the failure to follow certain COVID-19 guidelines, without more, is insufficient to satisfy the subjective prong of the deliberate indifference standard") (footnote omitted). Because Muhammad has presented no evidence that Defendants subjectively acted with deliberate indifference to the risk of COVID-19 exposure, his claim must fail as a matter of law.

Even considering non-COVID-19 cases, federal courts have uniformly held that a bare assertion that a prison or jail official failed to follow standard procedure is insufficient, as a matter of law, to demonstrate deliberate indifference. *See Davis v. Buchanan Cnty.*, 11 F.4th 604 (8th Cir. 2021) (reversing denial of summary judgment for deliberate indifference claim because defendants' failure to follow written procedures does not constitute per se deliberate indifference); *Luckert v. Dodge Cnty.*, 684 F.3d 808 (8th Cir. 2012) (same).

Moreover, under *Farmer*, a claim of deliberate indifference requires that the prison official (1) be actually aware of facts from which an inference could be drawn that a substantial risk of

[4] In the caption of *Greer*, the district court misspelled the last name of the defendant, Federal Bureau of Prisons Director Michael D. Carvajal. *See* 2022 WL 4826513, at *1.

harm exists, (2) actually draw the inference, but (3) nevertheless disregard the risk to the inmate's health. 511 U.S. at 837-38. Here, even if Muhammad could show that these Defendants knew of facts from which such an inference could be drawn, there is nothing in the record from which a reasonable fact-finder could conclude that the Defendants actually drew the inference that deviating from the mask distribution or disinfection of showers protocols would put Muhammad at substantial risk of contracting COVID-19. *See id.* at 837. Defendants' alleged deviation from COVID protocols may have been negligent—perhaps even grossly negligent—but that is insufficient, as a matter of law, to show deliberate indifference. *See id.* at 835; *Frost*, 152 F.3d at 1128. Accordingly, the Court **GRANTS** summary judgment as to Muhammad's Eighth Amendment claim. Dkt. 21.

## IV. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendants' motion for summary judgment is **GRANTED**. Dkt. 21.
2. The parties' requests for judicial notice are **DENIED AS MOOT**. Dkts. 21-4, 28.
3. The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated: September 29, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**